George M. TIDWELL, Commissioner of the Tennessee Department of Revenue, Appellant-Defendant,

v.

Harry BERKE, Appellee-Plaintiff.

Supreme Court of Tennessee.

Dec. 30, 1975.

William B. Hubbard, Asst. Atty. Gen., Nashville, for appellant-defendant; R. A. Ashley, Jr., Atty. Gen., Nashville, of counsel.

Harry Berke, Berke, Berke & Berke, Chattanooga, for appellee-plaintiff.

## OPINION

HARBISON, Justice.

This suit was instituted by appellee, Harry Berke, for a declaratory judgment and for recovery of certain corporate excise taxes assessed against him and paid under protest. The Chancellor allowed recovery of the taxes with interest, and the Commissioner of Revenue has appealed.

There is little controversy about the facts of the case. The issues involved, however, are of great importance in the administration of the Tennessee corporate excise tax law, and also to taxpayers who may be involved in corporate liquidations, because of certain differences which exist between the state law and the present federal income tax law and regulations governing corporate liquidations.

Prior to January 24, 1969, appellee Harry Berke and defendant below Thomas J. Northcutt were the sole stockholders of a Tennessee corporation, Brainerd Village, Inc. That corporation owned as its principal asset a shopping center, and the corporation was engaged in no other business enterprises than the ownership and operation of this center.

Prior to January 24, 1969, according to the testimony of Mr. Berke, certain proposals had been made to the officers and stockholders concerning the acquisition of the shopping center. A meeting of stockholders was held on January 24, 1969, according to minutes filed in the record, at which time an agent of the proposed purchaser of the center was present. He presented an offer of purchase which had previously been transmitted, and, according to the minutes, certain variations in the terms of the original proposals were discussed, although there was no change in the total sales price. The minutes recited that Mr. Northcutt presented a proposed contract of sale, "but because there were several provisions which the corporation could not agree to, the contract was not approved, and request for changes will be made prior to the closing of the sale."

The minutes then recite:

"It was agreed that the Corporation would, subject to last minute decisions at the time of the closing of the sale, transfer all of its assets to the Stockholders according to its liquidation plan and that the Stockholders would then convey title to the Shopping Center to the purchasers since the realty is the principal asset of the corporation. It was then proposed that after all the assets were transferred to the Stockholders that Harry Berke and Tom Northcutt would and did agree to permit the Corporation to act as their agents for the sole purpose of transferring title to the realty as agent for the Stockholders. It was agreed that if the sale is made it should be effective as of the close of the business day, January 31, 1969, and that Thomas J. Northcutt and Harry Berke would both personally supervise the terms and provisions of the closing in order to protect the interests of the Corporation and Stockholders."

The minutes further recite that:

"A Plan of Liquidation was prepared with the assistance of Dixie Lewis, Certified Public Accountant, a copy of which is hereto attached to the Minutes, and made a part thereof. It was agreed that the United States Treasury Department Revenue Form 966 entitled CORPORATE DISSOLUTION OR LIQUIDATION should be mailed to the Internal Revenue Service within thirty (30) days from January 31, 1969, as suggested by the Auditor."

Mr. Berke testified that a further meeting of stockholders was held on Monday, January 27, 1969, and these minutes were also filed in the record. It is stated that the meeting was called "for the purpose of discussing final plans for the sale by the Stockholders of the Stockholders interest in the Corporation pursuant to the plan of liquidation filed with the Federal Internal Revenue Service on January 24, 1969."

The minutes recite that it was agreed that the stockholders "should sell their assets in the corporation to the purchasers." The minutes then recite that in view of the total amount of the consideration for the sale, the corporation would act as agent for the stockholders "in order to avoid the almost prohibitive expense of recording one deed by the corporation to the Stockholders and then the Stockholders, in turn, executing and recording another deed to the ultimate purchasers." The minutes recite that the corporation agreed that it would act solely as "Agent for the Stockholders and all assets received by the corporation would be received by it as Agents for the Stockholders, and distributed to the Stockholders as per liquidation plan of January 24, 1969."

The plan of liquidation itself is dated February 1, 1969, signed by the secretary of the corporation, and the accountant who prepared it testified that it was actually prepared after the two stockholders' meetings above referred to, and that while he did not attend the meetings, he had the minutes of the two meetings before him when he prepared the plan.

The plan is a brief and simple one, providing for cessation of business on January 31, 1969, collection of all debts due the corporation and payment of all liabilities except those to be assumed by the purchaser of the building. The plan recites:

"Upon completion of, or provision for, payment of all liabilities, the remaining cash shall be distributed to the stockholders, pro rata, as a liquidating dividend."

The plan provides that long-term notes might be distributed to the stockholders in lieu of cash, and it concludes with this provision:

"When all assets have been converted to cash or notes and all liabilities have been paid, final distribution will be made to the stockholders in exchange for the cancellation and retirement of their stock."

This plan was actually transmitted by the accountant to the Director of the Internal Revenue Service on February 19, 1969, together with Form 966, reciting adoption of the plan on January 24, 1969 and a copy of a resolution purportedly passed by the stockholders on January 24, 1969, adopting the plan of liquidation. The text of the resolution itself does not appear in the minutes of the meeting of January 24 or the meeting of January 27.

A deed to the real estate held by the corporation was executed by the corporation on January 31, 1969 and recorded promptly thereafter. The deed is executed in the corporate name by Thomas J. Northcutt as President and Harry Berke as Secretary, and it contains the usual corporate form of acknowledgment by these officers, reciting that the deed was executed on behalf of the corporation by authority of its Board of Directors.

The form submitted to the Internal Revenue in February 1969 recites that the corporation had one hundred shares of ten-dollar par stock outstanding, and there are filed in the record two stock certificates, both owned by Mr. Berke at the time of the events here in question, each certificate in the amount of twenty-five shares. There is nothing in the record to indicate that Mr. Northcutt ever at any time surrendered his certificates, nor is the absence of his certificates otherwise explained in the record. Endorsed on the back of each of the two certificates of Mr. Berke, under date of January 27, 1969, is a statement that the shares were surrendered "By agreement between the corporation and the stockholders and pursuant to the plan of liquidation adopted by resolution dated 1/24/69 and to

the agreement and resolution as set out in the minutes of the corporation dated 1/24/69 and 1/27/69 . . . ."

This endorsement, signed by Mr. Berke, acknowledges receipt of fifty percent of the assets and equity in the corporation, including all real and personal property, and recites that the corporation is authorized to execute as agents all necessary instruments for Mr. Berke and other stockholders "necessary to complete the liquidation."

The accountant, under date of November 19, 1969, filed a "Statement of Intent to Dissolve" with the Secretary of State of Tennessee, purporting to contain the text of a resolution "to dissolve the corporation" stated to have been adopted at a meeting of the shareholders on February 1, 1969. There are no corporate minutes filed in the record under that date, but the resolution filed with the Secretary of State recites the adoption of the plan of liquidation and states that "the corporation through its directors and stockholders agree to an instant dissolution of the corporation, and surrender of the charter, and the officers are duly authorized to file all necessary proceedings to effect the dissolution." As stated, this resolution is stated in its text to have been adopted on February 1, 1969 and purports to bear acknowledgment of Mr. Berke as Secretary under date of February 1, 1969.

The preamble to this resolution contains the following:

"WHEREAS, Brainerd Village, Inc., a corporation has sold all of the assets of the corporation to a limited partnership consisting of a group of investors from Atlanta, Georgia; and

"WHEREAS, Brainerd Village, Inc., now owns no assets other than the proceeds of the sale; and

"WHEREAS, the corporation has agreed to a plan of liquidation; and

"WHEREAS, all of the stockholders have agreed as to the immediate division of the assets and for the distribution of funds hereinafter payable; and . . ."

Articles of dissolution, pursuant to T.C.A. § 48–1007, were not filed with the Secretary of State until some time after the filing of the statement of intention to dissolve. The text of the articles of dissolution bears date of December 26, 1969. This document contains verbatim the text of the January 24, 1969 plan of liquidation and recites that all debts and obligations of the corporation have been satisfied and that all of its assets have been distributed among its shareholders.

Mr. Berke testified on cross-examination that the corporation followed the plan of liquidation "as nearly as we could." He testified that the plan itself had been forwarded to the Internal Revenue Service in February. The following then occurred:

"Q Oh, I thought you testified that it was forwarded on January 24, 1969.

"A No, the Plan of Liquidation was on January 24, 1969. Obviously, if the stockholders were not going to be able to sell Brainerd Village, Inc., there would be—probably the Plan of Liquidation might fail.

"Q So, they were not sent to the Internal Revenue Service until after the sale of the Brainerd Village property?

"A Well, that's the proper way to do it; done in February.

"Q Why was the Plan of Liquidation signed by you in February of 1969 rather than on January 24, 1969?

"A Well, obviously, we had a meeting. We held up until we saw that the stockholders would successfully make the sale. Otherwise, we wouldn't want to dissolve the corporation, the corporation probably would continue to act. But this was the Plan of Liquidation. They can't all be done simultaneous. This is the plan, and it naturally has to follow the usual steps. So, as soon as the property was sold by the stockholders, then we continued on with the Plan of Liquidation."

Mr. Berke testified that the corporation followed the advice of its accountant, and

that he understood that a plan of dissolution could not be carried out "instantaneously".

Mr. Berke testified that the corporation "transferred its assets" to the stockholders on the date when Mr. Berke surrendered his shares of stock, January 27, 1969. He said that after that date there was no other business transacted "not even any meetings." He said that there were no further minutes at all after the January 27, 1969 minutes, so that there was no record of any surrender of the stock of Mr. Northcutt. Mr. Northcutt was a party defendant to this action, but did not appear at the trial nor is there any testimony in the record from him.

Mr. Lewis, the accountant for the corporation, testified that under Section 337 of the present federal income tax law, and the regulations issued pursuant thereto (26 U.S. C.A. § 337), a corporation may adopt a plan of liquidation, which has to be filed with the Internal Revenue Service within thirty days thereafter. He further stated that "you have twelve months to finally liquidate. the corporation."

It is apparent from the testimony of Mr. Lewis and from the corporate documents filed in the record that at all times the parties had in mind the federal statute and regulations, and apparently no consideration was given to the incidence of the Tennessee excise tax on corporate earnings, T.C.A. § 67-2701.

Mr. Allen Curtis, Director of the Franchise-Excise Tax Division of the Tennessee Department of Revenue, testified in the case. He pointed out and described the changes which occurred with regard to the taxation of liquidating dividends, insofar as federal taxation was concerned, in the enactment of the Internal Revenue Code of 1954. Mr. Curtis testified:

"Some years ago when the Federal Code was amended, there was an adoption of what came to be known as a Section 337 Liquidation. Under that section of the Federal Code, it was deemed proper that any earnings resulting from a corporate liquidation would be permitted to flow through the corporation and would be taxed to the corporate stockholders. In other words the Federal Government would exact its tax from the individual rather than from the corporation. Almost immediately, tax returns were filed with us upon liquidation whereby the corporation would report a 'Section 337 gain.' Some of the returns attempted to remove that gain from the excise tax base, some corporations, and the majority of them included that type of gain in the excise tax base.

"It has always been our position that the gain resulting to the corporation upon a sale of its corporate assets is a gain to be included in the measure of the excise tax privilege. And we have so taxed every gain resulting from such a transaction."

Mr. Curtis testified that if a corporation had actually completed dissolution and had actually distributed its assets to its stockholders, and the stockholders then in turn made a sale of those assets, the Department would not contend that the sales proceeds would be subject to the corporate excise tax.

On cross-examination Mr. Curtis stated that the Department of Revenue had taken the position throughout its negotiations with the taxpayers here that the sale of assets in this case was actually made by the corporation, which held legal title, and that in fact both legal and equitable title remained in the corporation at the time of the sale. He stated that if the stockholders in this case had actually received a deed from the corporation and had then deeded the property to the purchaser, the Department would consider that this "would be some indication . . . that the transaction was such that it should be beyond the corporate structure." He stated, however, that in all cases the Department attempted to "look to the substance" of a transaction, rather than to its outward form.

The Chancellor filed a memorandum opinion in this case in which he stated:

"A preponderance of the evidence is to the effect that the stockholders intended to liquidate the corporation, surrender its assets in return for the stock and sell the shopping center. The Court further finds that these intentions were carried out and the minutes of January 27, 1969, which are in the record as Exhibit 3, reveal that the stockholders were aware of the mechanical transfer of title to the real estate owned by the corporation and did not act unreasonably and designated the corporation as their agent to transfer title to the real estate, due to the obvious savings in real estate transfer fees."

The Chancellor felt that it was not necessary for the stockholders to actually receive a deed from the corporation and then in turn give a deed to the purchasers, in order to avoid the operation of the Tennessee Corporate Excise Tax. He cited and relied upon the recent decision of this Court in the case of *Dattell v. Tidwell*, 512 S.W.2d 550 (Tenn.1974), and awarded a recovery to Mr. Berke of the amount of excise tax involved in this case, some $34,230.13, with interest. In view of this disposition of the case, he made no adjudication as to any liability of the defendant Northcutt.

The facts of the case of *Dattell v. Tidwell, supra,* are indeed similar to those involved in the present case. In the *Dattell* case, however, the evidence adduced at the trial was not preserved in a bill of exceptions, so that the Court had before it only the allegations of the pleadings, which were necessarily taken as true, in view of the posture of the case on appeal. These allegations were to the effect that a corporation, similar to the one here involved, owned a piece of real estate in Memphis. The pleadings allege that the sole stockholder had commenced to formulate plans to liquidate the corporation and to take this property as a liquidating dividend pursuant to federal Internal Revenue rules and regulations. The pleadings recited that "On June 3, 1968, Waldat Real Estate Company,

Inc. was liquidated and all of its assets were distributed to Samuel Dattell, pursuant to Resolution of the stockholders and directors. Therefore, as of June 3, 1968, Samuel Dattell was the equitable owner for the property at 475–505 South Perkins, Memphis, Tennessee, but the legal title was still in the name of Waldat Real Estate Company, Inc." The pleadings then recited that on the following day, June 4, 1968, Mr. Dattell completed a sale of the assets and as equitable owner of the property directed the corporation to execute its deed to the property for him. The pleadings recited that the entire proceeds of the sale belonged to Mr. Dattell and were treated as such by all concerned.

Accepting as a fact that Mr. Dattell was the equitable owner of the property on the day before the sale was made, this Court found that the corporate excise tax was not due on the sale of the real estate to a third party, even though application to surrender the charter of the corporation was not filed until November 20, 1970. There was no discussion of the problems of corporate liquidation which may extend over a period of time, since under the record before the Court the corporation had been fully liquidated and its assets distributed prior to the sale of those assets to an outside purchaser.

The facts of the present case are different, and under them we do not find the *Dattell* case to be controlling.

The problem presented in the instant case is quite similar to problems which existed in the law of federal income taxation prior to the adoption of the 1954 Code. Under the 1939 Internal Revenue Code, when there was a liquidation of a corporation and sale of its assets, a crucial question of fact was presented as to whether the sale was made by the corporation itself or by the stockholders. If it was made by the corporation, the corporation incurred a capital gains tax. When it then made a distribution to stockholders in liquidation, the stockholders incurred a second tax upon the dividend. If, however, the sale was found to have been

made by the shareholders themselves after liquidation and dissolution, then the shareholders incurred a gain only in the liquidation upon receipt of the appreciated assets of the corporation; there was no gain involved in their subsequent sale of assets to third parties, if the sale price did not exceed the values used in the liquidation. Probably the leading case on the subject prior to 1954 was that of *Commissioner of Internal Revenue v. Court Holding Company*, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). In that case two shareholders caused a corporation to liquidate and to distribute to them its only asset, an apartment house. The shareholders then sold the apartment to the same purchaser who had originally negotiated with the corporation for the property, upon substantially the same terms. The United States Supreme Court found that the gain was taxable to the corporation, even though it had formally liquidated prior to the sale. The Court held that the substance of the transaction was a sale by the corporation, and that the liquidation was only an afterthought in an effort to effect a tax saving. See Note, "Taxing Corporate Liquidations: The Problem of *Commissioner v. Court Holding Co.*", 63 *Harv.L.Rev.* 484 (1950). In the case of *Cumberland Public Service Company v. U. S.*, 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950), the shareholders carefully liquidated the corporation before completing negotiations for the sale of its assets. Under those facts the United States Supreme Court held that the capital gain was taxable only to the shareholders, and not to the corporation. The Court found that whether the shareholders or the corporation made the sale depended largely upon a fact determination as to whether there was a "genuine" liquidating distribution to shareholders prior to the sale. See *Mertens, Law of Federal Income Taxation*, Vol. 2, § 17.05a, pp. 26–42.

Under Section 337 of the Internal Revenue Code of 1954, many of the problems surrounding the *Court Holding Company* decision and related cases were alleviated.

As previously pointed out, under the terms of this section and the applicable regulations (with exceptions and refinements not pertinent here), a corporation may make a sale of its assets within twelve months after the adoption of a plan of complete liquidation, without capital gains taxation at the corporate level.

The Tennessee law relating to transactions such as these, however, has not been changed by amendatory legislation, nor does Tennessee have a comprehensive personal income tax law similar to that of the United States Government. The Tennessee excise tax on corporate earnings, T.C.A. § 67–2701 et seq., is levied upon all net earnings of a corporate enterprise, regardless of their form. Although separately defined for federal income tax purposes, both capital gains and ordinary operating income are taxable to corporations under the Tennessee excise tax law. *Woods Lumber Co. v. MacFarland*, 209 Tenn. 667, 355 S.W.2d 448 (1962); *Brookside Mills, Inc. v. Atkins*, 204 Tenn. 517, 322 S.W.2d 217 (1959).

The Tennessee personal income tax on income from stocks and bonds, popularly known as the "Hall Income Tax", is contained in T.C.A. § 67–2601 et seq. Under this statute, ordinary corporate dividends are taxable to the recipients; but this Court expressly held in the case of *Gallagher v. Butler*, 214 Tenn. 129, 378 S.W.2d 161 (1964), that capital gains from the sale of stock and liquidating dividends received in redemption of stock upon dissolution of a corporation are not taxable as income.

Accordingly, the issue of whether a sale of assets is made by a corporation in liquidation or by its shareholders is no longer as acutely significant under Section 337 of the Internal Revenue Code as formerly, for purposes of federal taxes. It is still necessary to consider in detail the factual situation surrounding a corporate liquidation and sale of assets, however, under state taxing statutes. As pointed out in the *Dattell* case, *supra,* if the sale in fact is made

by the stockholders, after actually receiving corporate assets in liquidation, there is presently no state excise or income tax incident to the transaction, either to the corporation or to the selling shareholders. If the sale is made by the corporation itself, however, even though under a proposed plan of liquidation, it is still considered a corporate transaction and the resulting net proceeds are corporate earnings under the state's excise tax law.

The record indicates that all steps necessary to accomplish a Section 337 liquidation and sale of assets, so as to make federal capital gains taxes payable only by the shareholders, were accomplished in the present case; and apparently the federal authorities have approved the transaction. Unfortunately, however, the state taxes appear to have been overlooked, and it seems perfectly clear under the facts of the case that the plan of liquidation adopted was only a contingent one, and that it had not in fact been carried out at the time the sale of assets occurred. A plan to liquidate had been agreed upon, in principle at least. There can be no question however, but that the corporation itself made the sale, that it still existed, and under Mr. Berke's testimony, the corporation would have continued to exist had the sale not been made.

Although form seldom should be allowed to control substance, form is nevertheless important in connection with business organizations, with financial transactions and with taxation. Persons who have deliberately formed a corporation and have operated their enterprise in corporate form are not permitted to disregard that corporate form at will. See *Widdicombe v. McGuire*, 221 Tenn. 601, 607, 429 S.W.2d 815 (1968); *Shelby County v. Barden*, 527 S.W.2d 124 (Tenn.1975).

While a lack of uniformity between state and federal law is perhaps unfortunate, the revision of the state revenue laws is the province of the legislature. The 1954 Internal Revenue Code added a desirable flexibility to corporate liquidations, and obviated many problems which had arisen under prior law and its interpretation in the *Court Holding Company* case, *supra*. Tax counsellors and others concerned with corporate reorganization and liquidation in the state, however, must still handle corporate affairs with precision, if they are to avoid state corporate taxation. The present transaction was not handled with such precision. From the records which are filed and from the testimony the plan of liquidation was not finalized and executed prior to the sale of assets but only on February 1, 1969, after the sale, at the earliest. The situation was so represented to the Secretary of State when the notice of dissolution was filed in November 1969, where the corporation was referred to as having sold its assets and as owning as of February 1, 1969 "no assets other than the proceeds of the sale . . ." The plain inference from this document is that as of February 1, 1969 the corporation was the owner of the sales proceeds and that it was at that time distributing them to the stockholders.

The fact that the corporation was designated to act as the "agent" of the stockholders in making the conveyance of the real property, in and of itself, is not conclusive, although it certainly has probative value. As Mr. Curtis testified, it is some indication of the nature of the transaction. Tennessee levies a fairly substantial transfer tax upon the conveyance of real property, T.C.A. § 67–4102, Item S, which in a sale of the magnitude here involved would be nearly five thousand dollars. The desire of the stockholders to avoid the use of two deeds, therefore, was understandable and was not, in our opinion, absolutely fatal to the transaction under the holding in *Dattell, supra.* Stockholders who permit the corporation to continue in existence and to execute deeds, however, are certainly cutting the margin of safety to the very edge, and incur a risk that the transaction will be

deemed a corporate sale.[1] In the present case, the deed was in fact executed by the corporation, at a time when the corporation had not been liquidated and when the plan of liquidation was still contingent and subject to withdrawal or modification. There had been no actual finalized plan of liquidation nor actual distribution of assets to the stockholders, as was found to have occurred in the *Dattell* case, *supra*.

Accordingly it is our opinion that the corporate excise tax was due upon the consummation of the sale, and that the tax was properly collected from appellee under the provisions of T.C.A. § 67–2718.

The judgment of the Chancellor, therefore, awarding a recovery of the excise tax against the State of Tennessee is reversed, and the Commissioner of Revenue is dismissed as a party to the action.

The cause is remanded to the Chancery Court for determination of the respective rights and liabilities of Mr. Berke and Mr. Northcutt, as sought in the original complaint. Costs of the appeal are taxed to appellee. Costs in the trial court will abide the results there.

FONES, C. J., HENRY, J., and INMAN, Special Justice, concur.

COOPER, J., dissents.

COOPER, Justice (dissenting).

I agree with the majority opinion in the statement of legal principles which determine the excise tax liability of a corporation on the sale of real property. However, I do not agree with the conclusion of the majority that there had been no actual finalized plan of liquidation of the corpora-

tion nor actual distribution of assets to the stockholders prior to the sale of the shopping center and that the sale was within the corporate structure and subject to the excise tax. As I view the record, the evidence supports the chancellor in his finding that "a preponderance of the evidence is to the effect that the stockholders intended to liquidate the corporation, surrender its assets in return for the stock and sell the shopping center. . . . *[T]hese intentions were carried out* and the minutes of January 27, 1969, which are in the record as Exhibit 3, reveal that the stockholders were aware of the mechanical transfer of title to the real estate owned by the corporation and did not act unreasonably and designated the corporation as their agent to transfer title to the real estate owned by the corporation, due to the obvious savings in real estate transfer fees." (Emphasis supplied.) The plan to liquidate the corporation was adopted on January 27, 1969, and, on the same date, Mr. Berke endorsed his stock to the corporation and acknowledged receipt of fifty percent of the assets of the corporation as consideration for his stock. It was further set forth in the acknowledgement that the corporation was authorized to execute instruments for the sale of real estate as agent for Mr. Berke and the other stockholders. This method of transfer of corporate assets in the liquidation of a corporation was approved by this court as being one to which tax consequences will not attach. *See Dattell v. Tidwell,* 512 S.W.2d 550 (Tenn.1974).

I would affirm the decree of the chancellor and allow the appellee, Mr. Berke, to recover the corporate excise taxes assessed against him and paid under protest.

1. "While it is true that the stockholders ultimately own all of the assets of the corporation, the corporation itself, as a legal entity, has full title and ownership of said assets so long as they are in the possession of said corporation." *Gallagher v. Butler,* 214 Tenn. 129, 143, 378 S.W.2d 161, 167 (1964).